**Counsel of Record:**
**Christopher R. Kelly**
**Gregory R. Bockin**
**Securities and Exchange Commission**
**Philadelphia Regional Office**
**1617 JFK Blvd., Suite 520**
**Philadelphia, PA 19103**
**Telephone: 215-597-3100**
**Facsimile: 215-597-2740**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>      **Plaintiff,**<br><br>   v.<br><br>**JOHN A. DESALVO,**<br><br>      **Defendant.** | **Case No. 23-cv-8092**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), 1617 JFK Blvd., Suite 520, Philadelphia, Pennsylvania, 19103, alleges as follows against Defendant John A. DeSalvo ("DeSalvo"), 2211 Shore Road, Linwood, New Jersey, 08221:

## SUMMARY

1.      This case involves a brazen crypto asset securities fraud coupled with a separate investment fraud perpetrated by Defendant DeSalvo, a former New Jersey corrections officer who targeted law enforcement and first responders with his fraudulent schemes.

2.      DeSalvo created the so-called "Blazar Token," a crypto asset security that he claimed would eventually replace traditional state pension systems. From the launch of Blazar Token's so-called initial coin offering ("ICO") in November 2021, to its eventual collapse in May 2022, DeSalvo raised at least $623,888 from approximately 222 investors.

3.      In offering the Blazar Token to prospective investors, DeSalvo made numerous materially misleading statements and omissions, including, but not limited to, that: (1) the Blazar Token was registered with the Commission; (2) DeSalvo had arranged for the Blazar Token to be purchased through automated payroll deduction; and (3) investors were guaranteed to receive extraordinary investment returns.  DeSalvo also used much of the investor funds he received from the Blazar Token offering for improper purposes.

4.      Additionally, in May 2022—within days of when the Blazar Token was first offered on the crypto asset trading platform PancakeSwap—Defendant DeSalvo sold approximately 41 billion Blazar Tokens, notwithstanding the fact that he and the other Blazar Token investors who participated in the ICO were still in their purported lock-up period. DeSalvo's massive volume of sales placed downward pressure on the Blazar Token's trading price and drained PancakeSwap of the majority of its liquidity in the investment, resulting in its collapse and substantial investor losses.

5.      The Blazar Token scheme was not the first time that DeSalvo had defrauded investors and misappropriated their funds.  Through a separate investment fraud scheme that he started in late January 2021, DeSalvo solicited investors, primarily through Facebook, to participate in an investment program that he often referred to as the "E*Trade Invest Group." Between February 3 and February 10, 2021, DeSalvo raised approximately $95,000 from 17 investors.

6.      Shortly after depositing the investor funds in his brokerage account, however, DeSalvo lost a significant amount of the money making speculative investments.  He then misappropriated the remaining $78,000 by, among other things, transferring the money to his personal crypto asset wallets and paying a contractor to complete a bathroom renovation.  To

conceal his conduct, DeSalvo told the E\*Trade Invest Group investors that he lost their money due to poor market performance.

7.      By engaging in the conduct described in this Complaint, Defendant violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77(e)(a) and (c) and 77q(a)].

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)] and Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)] to permanently enjoin Defendant from engaging in such transactions, acts, practices, and courses of business alleged in this Complaint, and to obtain disgorgement, prejudgment interest, and civil money penalties, and such other and further relief as the Court may deem just and appropriate.

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)].

10.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 22(a) of the Securities Act [15 U.S.C. § 77v(a)].  Defendant is located, resides, and transacts business in the District of New Jersey.  Additionally, certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of New Jersey, and were effected, directly or indirectly, by making

use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## DEFENDANT

11.     **John A. DeSalvo**, age 47, is a resident of Linwood, New Jersey.  He is the Founder and CEO of Blazar Token And The Moonfuel Protocol, LLC.  He is a former Lieutenant in the New Jersey Department of Corrections and is the owner of a parking lot sealcoating company.

## RELATED ENTITY AND INDIVIDUAL

12.     **Blazar Token And The Moonfuel Protocol, LLC** ("BTMP"), was incorporated in mid-May 2022 as a New Jersey limited liability company with a principal place of business in Marmora, New Jersey.  BTMP operated as DeSalvo's alter ego in that DeSalvo controlled it. Neither the Blazar Token itself nor BTMP are, or were at any time, registered with the Commission in any capacity.  Nor were any offers or sales of the Blazar Token or BTMP registered with the Commission.

13.     **Former Blazar Token Partner**, age 36, is a resident of Williamstown, New Jersey.  From January 2022 to May 2022, he was a partner in connection with DeSalvo's efforts to launch the Blazar Token.  He is a police officer in a New Jersey township.

## FACTS

### DeSalvo Offered and Sold the Blazar Token as Securities

14.     Starting in approximately November 2021, DeSalvo offered investors opportunities to profit from crypto-asset related investments in the Blazar Token.

15.     All told, DeSalvo raised at least $623,888 from approximately 222 investors in connection with his offering of the Blazar Token.  DeSalvo accepted payment for Blazar Token investments in both cash and crypto assets.

16.     DeSalvo developed and pitched the Blazar Token as an alternative to state pension systems for police officers, fire personnel, and first responders.  In a Blazar Token "whitepaper," which DeSalvo drafted to provide prospective investors with details about the project, DeSalvo wrote that investors would "transition out of the current pension system and into one of the future" by purchasing the Blazar Token.

17.     The whitepaper also described the Blazar Token as "the first token or coin that is able to be purchased through payroll deduction every week," and stated that "it will be taken out of one's weekly earnings pretax similar to payment into a pension, 401k, IRA or any other retirement savings plans."

18.     DeSalvo primarily marketed and solicited prospective investors in the Blazar Token with a focus on law enforcement personnel through various online media, including in Facebook groups relating to law enforcement officer investing, Telegram, Stocktwits, multiple websites that he created for the project, and on his personal Facebook page.  DeSalvo also contacted prospective Blazar Token investors through direct phone calls and electronic messages to his network of contacts.

19.     DeSalvo also used paid press release distribution services to market the Blazar Token.  In one such press release dated December 5, 2021, entitled "Blazar Initial Token Offering is Already a Huge Hit," DeSalvo wrote that "enthusiastic customers have lapped up the Blazar Token, making it one of the biggest token launches in recent times."

20.     In connection with his solicitation of Blazar Token investors, DeSalvo disseminated a contract that set forth, among other things, how Blazar Token's management team would use investor funds.  Specifically, the contract stated that "proceeds from token sales during the ICO will be used for the development of the token, gas fees, advertising, marketing, exchange listing fees, and liquidity."

21.     The contract also stated that "there will be absolutely no use of Blazar Token's funds for the self-interest of any Member of Blazar Token's management team."

22.     Initially, DeSalvo was solely responsible for launching the Blazar Token. DeSalvo's responsibilities included developing Blazar Token's whitepaper, creating marketing materials, generating "buzz" on social media, and soliciting investors.

23.     In January 2022, in exchange for an investment of approximately $25,000, DeSalvo brought on Former Blazar Token Partner, a New Jersey police officer, as a partner in the development of the Blazar Token.  Former Blazar Token Partner reported to DeSalvo, and was primarily responsible for assisting in the solicitation of investors and overseeing the software developers hired to build and code Blazar Token's smart contract.

24.     Despite Former Blazar Token Partner's role as partner and his involvement in the day-to-day operations of developing the Blazar Token, DeSalvo retained full control over all Blazar Token-related decision making.  For example, only DeSalvo had access to the bank accounts and crypto asset wallets where investor funds were deposited and was responsible for all decisions regarding the use of investor funds.

25.     DeSalvo launched Blazar Token's ICO in early November 2021.  Most ICO purchasers received "placeholder tokens" initially, during the development, and prior to the

actual launch, of the Blazar Token, but those placeholders were replaced by actual Blazar Tokens in April 2022.

26.　　On April 21, 2022, the Blazar Token was first offered for trading on the crypto asset trading platform PancakeSwap.

27.　　Investments in the Blazar Token were investments in a common enterprise.

28.　　DeSalvo commingled both the cash and crypto asset investments that he received from Blazar Token investors with his personal funds in personal accounts held in his name.

29.　　DeSalvo purported to use funds received from Blazar Token investors to fund and develop the marketing of the Blazar Token.

30.　　DeSalvo pitched the Blazar Token as an investment opportunity and boasted that investors in the Blazar Token would receive substantial profits from their investments based on the appreciation in its price.

31.　　Had the Blazar Token appreciated in value and been successful as an investment opportunity, investors would have reasonably expected to share in that success equally through an increase in the value of their respective Blazar Tokens.

32.　　Based upon DeSalvo's public statements as further set forth below, investors had a reasonable expectation of profits to be derived from DeSalvo's efforts.  The profits of the Blazar Token investors were to be the result of DeSalvo's efforts to procure additional investments, including as a result of automatic payroll deductions.  In particular, DeSalvo claimed that increases in the Blazar Token's future trading price would be directly linked to his ability to register a large number of payroll deduction "accounts."

33.     DeSalvo offered to sell, and in fact sold, Blazar Tokens in a general solicitation through the mails or use of means or instruments of transportation or communication in interstate commerce.

34.     DeSalvo offered and sold Blazar Tokens to investors living in at least 11 states through multiple channels, including Facebook, telephone, and email, while there was no registration statement filed or in effect as to the Blazar Token offering.

35.     DeSalvo did not take reasonable steps to verify the accreditation status of the investors in the Blazar Token, and at least some of the investors in the Blazar Token were not accredited.

### DeSalvo Made False and Misleading Statements and Omissions about the Blazar Token

36.     DeSalvo made numerous false and misleading statements and omissions about the Blazar Token, including that:  (1) the Blazar Token was registered with the Commission; (2) DeSalvo had arranged for Blazar Tokens to be purchased through automated payroll deductions; and (3) the Blazar Token was guaranteed to provide exorbitant returns.

#### DeSalvo Falsely Claimed that the Blazar Token Was Registered With the Commission

37.     Beginning in at least November 2021 and continuing through April 2022, in press releases, phone calls, and Facebook posts, DeSalvo told investors that he had registered the Blazar Token with the Commission.

38.     For example, in a December 2021 private Facebook message to an investor who questioned whether the Blazar Token was registered as a security, DeSalvo wrote, "With the SEC yes.  We are the FIRST EVER!!!"

39.     In a January 2022 Stocktwits post promoting the Blazar Token ICO, DeSalvo wrote, "we became a securitized token with the SEC."

8

40.     Additionally, in April 2022, in response to a prospective investor who would not invest if the Blazar Token were not "SEC registered," DeSalvo replied, "I've been designated a securitized token by the SEC already."

41.     During the same period, and despite having told certain investors that the SEC registration was finalized, DeSalvo authored at least four press releases that stated he was in the process of applying to the Commission to have the Blazar Token designated a "securitized token."

42.     DeSalvo later sought ideas for how to frame the Blazar Token as a so-called "utility" token in an apparent attempt to avoid regulatory oversight.

43.     In a private voice message, DeSalvo stated "Blazar is sure as hell a security token . . . we want to come up with some bullshit that says it's doing something not to do with money."

44.     For at least some of the investors in the Blazar Token, Blazar Token's purported registration with the Commission was one of the primary reasons they felt comfortable investing with DeSalvo, as it added a sense of legitimacy to the ICO.

45.     In reality, the Blazar Token was not registered with the Commission, nor had the Blazar Token submitted any draft (or other) registration statements to the Commission, nor were any registration statements filed or in effect as to any offer or sale of Blazar Tokens.  DeSalvo knew, or was reckless in not knowing, these facts.

<u>DeSalvo Falsely Claimed that He Had Arranged for the Blazar</u>
<u>Token to be Purchased Through Automated Payroll Deduction</u>

46.     DeSalvo pitched the Blazar Token to investors as a "pension supplement" and claimed it was designed to allow investors to purchase Blazar Tokens through automatic payroll deduction.

47.     DeSalvo referred to this feature as a "crypto first" and claimed that increases in the Blazar Token's future trading price would be directly linked to his ability to register a large number of payroll deduction "accounts."

48.     As he communicated to investors, DeSalvo's investment pitch was that the steady stream of weekly purchases via payroll deduction would increase the demand for the Blazar Token and, in turn, its trading price.  Without automated payroll deduction, however, there would be significantly less demand for the Blazar Token, which would have a negative impact on its price.

49.     In his first post on the Facebook All [Law Enforcement Officer] Crypto Group in November 2021, DeSalvo wrote:  "We have already secured being listed as a Payroll Deduction in 11 states."

50.     In the next several weeks, DeSalvo wrote in at least three press releases that investors were able to purchase Blazar Tokens through payroll deductions.

51.     In April 2022, in a Telegram post to the Blazar Token investor community, he claimed that the Blazar Token was the "1st token ever to have over 25,000 ACH accounts ready to go for weekly deductions!"

52.     These statements were important to many of the Blazar Token investors when determining whether or not to purchase the Blazar Token.

53.     DeSalvo's statements to Blazar Token's investors and prospective investors about the availability of an automated payroll deduction to purchase the Blazar Token were false or misleading, as demonstrated by DeSalvo's own statements in texts and private Facebook messages.

54.     In March 2022, DeSalvo texted one of his developers:  "[Former Blazar Token Partner] and I need to contact a lot of places to try to get payroll/ACH rolling."

55.     In April 2022, DeSalvo told a Blazar Token investor:  "[W]hat I really need to figure out is a company that will allow us to have ACH," and messaged another investor: "[W]hat we need bro is ACH. I can't find anyone to take it."

<u>DeSalvo Falsely Guaranteed Exorbitant Blazar Token Returns</u>

56.     DeSalvo falsely guaranteed that Blazar Token investors would receive exorbitant returns on their investments.

57.     Among other guarantees, DeSalvo promised at least one investor that the price would appreciate 300% when trading commenced on PancakeSwap, such that their $25,000 investment would yield income of $100,000 per month and would be worth $1 million within one year.

58.     DeSalvo falsely promised a number of other investors that he would pay their money back if the value of Blazar Tokens depreciated.

59.     DeSalvo also made other false and outlandish return guarantees to prospective investors in writing, including:

    a)      "This is a GUARANTEED MINIMUM 100X Your money";

    b)      "What if I told you BLAZAR Token can get you 22.1% GUARANTEED and it's not a lie?  Well we can … 22% GUARANTEED with ZERO risk"; and

    c)      "This is no longer a maybe, it's as solid as solid gets with the highest average annual return EVER seen on large sums of money.  To be able to

guarantee someone 20%+ on BILLIONS of dollars has NEVER been seen EVER.  Well that's about to."

60.     DeSalvo made these statements concerning the guaranteed investment returns on the Blazar Token without any reasonable basis to believe they were true.

61.     DeSalvo's public statements concerning the lofty returns omitted any language concerning the risks associated with investing in ICOs, crypto assets, or securities more broadly.

<u>DeSalvo Misappropriated Blazar Token Investor Funds and Used
Investor Funds in a Manner Inconsistent With Statements to Investors</u>

62.     Of the at least $623,888 that DeSalvo raised in the Blazar Token offering, the majority of it was deposited into DeSalvo's personal bank account or one of several crypto asset wallets under his control.  As a result, DeSalvo had access to the Blazar Token investor proceeds and exclusive control over how such funds were used.

63.     Although DeSalvo told investors that their funds would be used solely for development of the Blazar Token, and for gas fees, advertising, marketing, "exchange listing fees," and liquidity associated with it, DeSalvo misappropriated investor funds and used investor proceeds in a manner inconsistent with his disclosures to investors.

64.     First, DeSalvo used investor funds for his personal expenditures.

65.     Between November 2021 and May 2022, nearly $267,000 in investor cash was routed through DeSalvo's personal bank account.

66.     DeSalvo misappropriated approximately $54,000 of investor funds in order to pay for his personal expenditures and cash withdrawals.

67.     Second, DeSalvo misappropriated ether ("ETH") received from investors, as well as ETH purchased with investor funds.

12

68.     Between November 2021 and May 2022, DeSalvo accumulated more than 14 ETH received from Blazar Token investors or purchased with investor funds, which at the time was worth more than $47,000.

69.     On August 30, 2022, after Blazar had collapsed, and without investor knowledge or approval, DeSalvo sold all of his ETH and transferred the proceeds to his personal bank account.  DeSalvo then transferred a portion of such funds to personal brokerage accounts and spent the rest on personal expenses.

70.     Third, DeSalvo regularly sent Blazar Token investor funds to his personal crypto asset wallets, where he speculated in other, more volatile crypto assets.

71.     For example, in May 2022, an investor transferred 1.07 bitcoin ("BTC") valued at more than $41,000 to a DeSalvo-controlled crypto asset wallet as a means to fund a Blazar Token purchase.  The following day, DeSalvo sold 1.07 BTC for $41,090 and used the proceeds to purchase nearly 11,000 Kyber Network Crystal ("KNC") tokens.

72.     Over the next week, KNC's trading price plummeted and, by mid-May, DeSalvo had sold nearly all of the KNC that he purchased using investor funds and realized losses of more than $18,500—approximately 45%—of the investor's funds, which were supposed to be used to fund the development of the Blazar Token.

73.     Fourth, DeSalvo used investor funds to repay an investor who threatened legal action against him.

74.     In May 2022, many investors noted the precipitous decline in the price of the Blazar Token from its early trading levels and confronted DeSalvo to determine the reasons for its poor performance.

13

75.     Rather than tell his investors the truth—that the price decline was largely the result of his substantial selling of his own Blazar Tokens—DeSalvo lied and claimed it was Former Blazar Token Partner who had sold a large number of Blazar Tokens, and that he had fired Former Blazar Token Partner and was considering legal action.

76.     To placate an investor who threatened to sue, DeSalvo repaid him with tether (USDT) valued at $21,353, using previously raised funds from another investor.

77.     This was the only time any of the ICO investors received any money back from DeSalvo for their investment.

<u>DeSalvo Made Money to the Detriment of the Other Investors in the Blazar
Token by Selling a Large Quantity of his Blazar Tokens During the Lock-Up Period</u>

78.     The Blazar Token ICO concluded on April 21, 2022, when the Blazar Token was made available for trading on PancakeSwap.

79.     Pursuant to the terms of the contract drafted by DeSalvo, and provided to at least some investors, however, investors in the Blazar Token ICO were prohibited from selling their Blazar Tokens for a ninety-day window after the ICO.  The contract also stated that the "founders tokens" owned by DeSalvo could not be sold for six months post-ICO.  The Blazar Token whitepaper represented to investors and prospective investors that DeSalvo had an even longer lock-up period that prevented him from selling for one year.

80.     Notwithstanding these promised limitations, between May 11 and May 22, 2022—during the lock-up period in which DeSalvo had represented that he would not sell his "founders tokens"—DeSalvo sold more than 41 billion Blazar Tokens (which included his "founders tokens") on PancakeSwap.  This represented substantially all of the Blazar Tokens that DeSalvo controlled and was worth the equivalent of $51,000.

81.     DeSalvo's massive sales volume had a dramatic negative impact on Blazar Token's trading price—resulting ultimately in the collapse of the price of the Blazar Token—and, consequently, investors suffered significant losses on their investments.

82.     For example, a Blazar Token investment that was worth approximately $1,000 prior to DeSalvo's first sales on May 11 was only worth approximately $0.41 after DeSalvo's sales on May 22.

83.     DeSalvo received all of the funds from his Blazar Token sales into one of his personal crypto asset wallets.

84.     The Blazar Token price never recovered following its collapse after DeSalvo's sales, and the large majority of Blazar Token purchasers are left holding these nearly worthless crypto asset securities.

85.     DeSalvo knew, or was reckless in not knowing, (1) that he had represented that he would not sell his "founders tokens" during this time period; and (2) the likely adverse effect that his sales activity would have on the price of the Blazar Token.

### The E*Trade Investment Group Fraud

86.     Prior to his Blazar Token scheme, beginning in late January 2021, DeSalvo engaged in a securities investment fraud scheme in connection with what he called the "E*Trade Invest Group."

87.     On January 19, 2021, DeSalvo opened an E*Trade brokerage account in his own name.  DeSalvo established no legal entity for the investment group.

88.     Prior to receiving funds from any investment group participants, the account was valued at $380.

DeSalvo Solicited Investors to Participate in an Investment Group

89.     DeSalvo primarily solicited investors for the "E*Trade Invest Group" on his personal Facebook page, telling them that he was seeking to raise a total of $100,000 from 20 people.  In a Facebook post, DeSalvo also provided instructions on how to transfer funds directly into his E*Trade brokerage account.

90.     In emails to investors, DeSalvo explained that he would invest their funds in various securities, including options, stocks, and crypto assets.

91.     Between February 3 and February 10, 2021, 17 investors sent DeSalvo a total of $95,000 to participate in the investment group.  Other than the initial $380, DeSalvo did not put any additional personal funds into the account.

92.     DeSalvo told investors that their money would grow significantly because of his investment expertise.

93.     In an email to investors, DeSalvo stated, "I have been averaging close to 1200% over the last 2 years.  I am in the top 1,000th percent in the world."

94.     In a private Facebook message to an investor, DeSalvo stated, "I've done this three times since the summer.  I'm not guaranteeing we get the same results, but so far the other three accounts are all over one-half million and they started with over $25,000…."

95.     His pitch was simple:  because of his purported track record investing, all the investors needed to do was, as he put it in one Facebook post, "sit back and relax and get rich."

96.     DeSalvo told investors that his goal for the fund was to turn the $100,000 initial investment pool into $1 million by the end of the summer.

97.     These statements were false and misleading.

98.     Contrary to his representations, DeSalvo was not averaging close to 1,200 percent on his investments over the last two years, nor did he otherwise have the investment track record that he claimed to have.

99.     DeSalvo also did not invest the funds raised for the investment group's benefit.

<u>DeSalvo Misappropriated Investor Funds for His Own Personal Benefit</u>

100.     DeSalvo initially purchased securities in his E*Trade brokerage account that he had opened in January 2021 in a manner consistent with his statements to investors.

101.     In early February 2021, DeSalvo primarily purchased highly speculative, near-expiration call options as well as equity securities.

102.     In the first week, the investments performed well, rising in value to over $140,000.  DeSalvo also sent the investors near daily emails with general comments on holdings and daily performance.

103.     However, beginning on February 10, 2021, and continuing over the next trading week, the investment group's holdings lost nearly 50% of their value from their prior highs.

104.     By February 18, 2021, the group's holdings were only worth approximately $77,000.

105.     As the account's value began to decline, DeSalvo stopped sending emails to his investors.

106.     As the investment group's holdings lost value, DeSalvo also began transferring funds out of his E*Trade brokerage account for his own personal benefit.

107.     On February 11, 2021, DeSalvo transferred $4,656 from the brokerage account to one of his personal bank accounts to pay credit card bills and to withdraw cash from an ATM.

108.    Between February 19 and February 24, 2021, DeSalvo liquidated the remaining positions and transferred the funds—more than $78,000—to his personal bank account.

109.    On February 24, 2021, in a private Facebook message, after draining the brokerage account, DeSalvo told one investor: "We're done. Biggest crash of the Nasdaq in 27 years. . . . 11 of 13 days down in a row."

110.    Of the over $82,000 that he misappropriated from his investors, DeSalvo: (1) transferred over $56,000 to one of his personal crypto wallets; (2) issued a $10,000 check to a contractor who was in the process of renovating his bathroom; and (3) transferred more than $6,000 to a brokerage account in the name of his daughter.

111.    In his crypto asset wallet, DeSalvo traded various speculative and volatile crypto assets and made frequent transfers both to and from his other crypto asset wallets, his personal bank account, and his brokerage accounts.

112.    In sum, DeSalvo looted the group's brokerage account, and it ended February 2021 with a zero balance.  DeSalvo kept the majority of their money for himself and returned none of it to his investors.

### DeSalvo Lied to Investors to Conceal His Misconduct

113.    In mid-May 2021, DeSalvo resumed sending emails to the investment group.

114.    DeSalvo apologized to the group, claiming that he was "just notified" that no one had received any of the 77 emails he had purportedly sent to the group since February, notwithstanding the fact that an investor had emailed him more than two months earlier asking why he had stopped communicating with them.

115.    DeSalvo falsely told his investors that the account had suffered significant losses due to the White House's infrastructure plans and that the account ended February with around $27,000.

116.    Subsequent emails from DeSalvo continued to claim that he lost their money due to poor market performance.  DeSalvo did not disclose to the investors his misappropriation of their funds.

### Defendant Violated the Securities Laws

117.    The investments in the Blazar Token offered and sold by Defendant were securities within the meaning of the Securities Act and Exchange Act.  The investments to be purchased or sold by Defendant in connection with the E*Trade Invest Group also were securities within the meaning of the Securities Act and Exchange Act.

118.    An investment contract (a type of security) exists when individuals or entities: (a) invest money or otherwise exchange value (including dollars, crypto assets, and other consideration such as labor); (b) in a common enterprise; (c) with a reasonable expectation of profits to be derived from the entrepreneurial and managerial efforts of others.

119.    Blazar Token investors provided DeSalvo with money or otherwise exchanged value in connection with their investments.

120.    The investments in the Blazar Token were all in a common enterprise.  Investors played no role in the management or operations of the businesses of the Blazar Token.

121.    Defendant repeatedly told investors that the value of the Blazar Token would significantly increase based upon Defendant's efforts.  Blazar Token investors expected profits to be derived from DeSalvo's efforts.

122.     Neither the Blazar Token itself, nor BTMP, are, or were at any time, registered with the Commission in any capacity.  Nor were any registration statements filed or in effect as to any offer or sale of Blazar Tokens or BTMP.

123.     Defendant's offer and sale of the Blazar Token was a general solicitation through the mails or use of means or instruments of transportation or communication in interstate commerce.

124.     Through multiple channels, including Facebook, telephone, and email, DeSalvo offered and sold Blazar Tokens to investors living in at least 11 states.

125.     At least some of the investors in the Blazar Token were not accredited and, in any event, DeSalvo did not take reasonable steps to verify the accreditation status of the investors.

126.     DeSalvo engaged in the offer and sale of the securities of the Blazar Token by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

127.     Directly or indirectly, DeSalvo made materially false and misleading statements and omissions to Blazar Token investors and prospective investors concerning, among other things:  (1) whether the Blazar Token (or its offer/sale) was registered with the Commission; (2) whether DeSalvo had arranged for the Blazar Token to be purchased through automated payroll deductions; (3) whether the Blazar Token was guaranteed to provide exorbitant returns; and (4) DeSalvo's use of investor funds.  Defendant, directly or indirectly, knowingly or recklessly made such material untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.     Directly or indirectly, DeSalvo made materially false and misleading statements and omissions to E*Trade Invest Group investors and prospective investors concerning:  (1) his

prior returns from other investment groups; and (2) DeSalvo's use of investor funds.  Defendant, directly or indirectly, knowingly or recklessly made such material untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129.    A reasonable investor would consider the misrepresented facts and omitted information described herein important in deciding whether or not to invest.

130.    The untrue statements of material fact and material omissions described herein were made in the offer or sale and/or in connection with the purchase or sale of securities.

131.    In connection with the conduct described herein, Defendant acted knowingly or recklessly.  Defendant knew or was reckless in not knowing that Defendant was making material misrepresentations and omitting to state material facts necessary to make certain statements not misleading under the circumstances.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

132.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 131, inclusive, as if they were fully set forth herein.

133.    By engaging in the conduct described above in connection with the Blazar Token and E*Trade Invest Group, Defendant, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

a)       employed devices, schemes or artifices to defraud;

b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c)      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

134.    By engaging in the foregoing conduct, Defendant violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

135.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 131, inclusive, as if they were fully set forth herein.

136.    By engaging in the conduct described above in connection with the Blazar Token, Defendant knowingly or recklessly, in the offer or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a)      employed devices, schemes, or artifices to defraud;

b)      obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c)      engaged in transactions, practices, or courses of business which operated

or would operate as a fraud or deceit upon purchasers of securities.

137.    By engaging in the foregoing conduct, Defendant violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

### Violations of Section 5(a) and (c) of the Securities Act

138.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 131, inclusive, as if they were fully set forth herein.

139.    By engaging in the conduct described above in connection with the Blazar Token, Defendant, directly or indirectly:

  a)    made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use of medium of any prospectus or otherwise, securities as to which no registration statement was in effect;

  b)    for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

  c)    made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

140.    By engaging in the foregoing conduct, Defendant violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

23

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant DeSalvo from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77(e)(a) and (c) and 77q(a)];

### II.

Permanently restraining and enjoining Defendant DeSalvo from, directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, offer, or sale of any security, including any crypto asset security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

### III.

Ordering Defendant DeSalvo to disgorge ill-gotten gains as a result of the violations alleged herein, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### IV.

Ordering Defendant DeSalvo to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] for violations of the federal securities laws as alleged herein; and

**V.**

Granting such other and further relief as this Court may deem just and proper.

Dated:  August 23, 2023

Respectfully submitted,

BY: _____

Christopher R. Kelly
Gregory R. Bockin
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
KellyCR@sec.gov
BockinG@sec.gov
*Attorneys for Plaintiff*
SECURITIES AND EXCHANGE
COMMISSION

Of Counsel:

Assunta Vivolo
Brian P. Thomas
David W. Snyder

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>JOHN A. DESALVO,<br><br>    Defendant. | Case No. 23-cv-8092 |

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), because the Commission does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action. Therefore, service upon the United States or its authorized designee, Angela Juneau, Assistant United State Attorney, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, Suite 700, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

Respectfully Submitted,

Christopher R. Kelly
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
KellyCR@sec.gov
*Attorney for Plaintiff*
SECURITIES AND EXCHANGE
COMMISSION